In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3386

IN RE: A WITNESS BEFORE THE SPECIAL
GRAND JURY 2000-2.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 GJ 596—**Marvin E. Aspen**, *Chief Judge.*

ARGUED OCTOBER 29, 2001 — DECIDED APRIL 23, 2002*

Before FLAUM, *Chief Judge*, and POSNER and DIANE P.
WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* The central question on
this appeal is whether a state government lawyer may
refuse, on the basis of the attorney-client privilege, to
disclose communications with a state officeholder when
faced with a grand jury subpoena. The district court found
that in the context of a federal criminal investigation, no
such government attorney-client privilege existed. We
agree with this determination, and therefore affirm.

## I

Roger Bickel was employed by the state of Illinois as
Chief Legal Counsel to the Secretary of State's office

---

*This opinion is being initially released in
typescript. The printed version will follow.

during the first four years of former Secretary (now Governor) George Ryan's administration. Bickel provided legal counsel and advice to Ryan and other Secretary of State officials as they carried out their public duties. Bickel has also served as a personal lawyer to Ryan, his wife, and Ryan's campaign committee, Citizens for Ryan, since at least 1989.

For the past three years, federal prosecutors have been investigating a "licenses for bribes" scandal in the Illinois Secretary of State's office, dubbed "Operation Safe Road." The alleged (and in some instances admitted) corruption extends to the improper issuance of commercial drivers' licenses, specialty license plates, leases, and other contracts; the improper use of campaign funds for the personal benefit of Secretary of State employees; and obstruction of justice in connection with internal office investigations. Because of his role in advising then-Secretary Ryan, federal prosecutors sought to discuss these matters with Bickel. Initially, they tried scheduling a voluntary interview with him for this purpose, but Ryan objected to the meeting and advised both Bickel and the federal prosecutors that he had not waived and would not waive the attorney-client privilege with respect to any of his prior conversations with Bickel.

After several avenues for resolving the problem proved unsuccessful, the federal prosecutors served a subpoena from the grand jury that commanded Bickel to appear and testify before that body about all conversations he had with Ryan in his official capacity as General Counsel. They also obtained a motion to compel Bickel to testify about those matters. Finally, the United States secured a letter from Illinois' current Secretary of State, Jesse White, in which the latter purported to waive the Office's attorney-client privilege as to all of Bickel's official conversations with "all personnel and officials of the Secretary of State, regardless of their particular position or office." Ryan continued to oppose all efforts to obtain allegedly privileged information from Bickel.

On September 7, 2001, the district court granted the United States' motion to compel, finding that no attorney-client privilege attached to the communications at issue, and, alternatively, that if a privilege did attach, White had effectively waived it.  While the motion to compel does not create a final judgment, we permit clients to immediately appeal a court order that their attorney testify before a grand jury under the exception recognized in *Perlman v. United States*, 247 U.S. 7 (1918). See *United States v. Evans*, 113 F.3d 1457, 1458 (7th Cir. 1997); *In re Grand Jury Proceeding*, 68 F.3d 193, 195 (7th Cir. 1995); *United States v. Davis*, 1 F.3d 606, 607 (7th Cir. 1993). We therefore have jurisdiction over this appeal.

**II**

We review *de novo* the question whether Ryan may invoke the attorney-client privilege to shield Bickel's testimony before the federal grand jury.  See *Upjohn Co. v. United States*, 449 U.S. 383 (1981). The federal courts have authority to recognize privilege claims under the federal common law.  Fed. R. Evid. 501.  While Rule 501 manifests a congressional desire to grant courts the flexibility to determine privileges on a case-by-case basis, *Trammel v. United States*, 445 U.S. 40, 47 (1980), "these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974); *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000).

One of the oldest and most widely recognized privileges is the attorney-client privilege, which protects confidential communications made between clients and their attorneys for the purpose of securing legal advice. *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998). It is well established that a client may be either an individual or a corporation.  See, *e.g.*, *Upjohn*, 449 U.S. at 390 (1981).  But here, we have a special case: the client is neither a private individual nor a private corporation. It

is instead the State of Illinois itself, represented through one of its agencies. There is surprisingly little case law on whether a government agency may also be a client for purposes of this privilege, but both parties here concede that, at least in the civil and regulatory context, the government is entitled to the same attorney-client privilege as any other client. See *Green v. IRS*, 556 F. Supp. 79, 85 (N.D. Ind. 1982) (privilege "unquestionably" applies to conversations between government lawyers and administrative personnel), *aff'd*, 734 F.2d 18 (7th Cir. 1984); *Restatement (Third) of Law Governing Lawyers* § 74 (2000) ("[T]he attorney-client privilege extends to a communication of a governmental organization."). We therefore proceed on that basis.

In the case of private parties, the privilege functions identically in both civil and criminal proceedings. *Swidler*, 524 U.S. at 408-09 (finding "no case authority for the proposition that the privilege applies differently in criminal and civil cases"). The United States, however, contends that the privilege between a government attorney and her official client does not extend to criminal proceedings, such as a grand jury investigation. It is supported in that position by decisions of two courts of appeals (both with thoughtful dissents) arising from Independent Counsel investigations of President Clinton. See *In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998); *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997). Ryan argues that those cases were wrongly decided, at least insofar as they might apply here to support a distinction between governmental clients and private clients.

The first question we face is whether recognizing a privilege in this case would be an expansion of the current scope of the attorney-client privilege, or if a refusal to recognize the privilege would amount to a contraction of an existing privilege. Although this may seem like two sides of the same coin, it is not: the Supreme Court has instructed us, in developing a federal common law of

privileges, to avoid either derogating existing privileges or extending privileges to new, uncharted waters absent compelling considerations. *Jaffee v. Redmond*, 518 U.S. 1, 9 (1996). Unfortunately, there is no clear-cut answer to this question because, outside of former Secretary Ryan and the Clinton administration, only one government body, the Detroit City Council, has ever attempted to claim such a privilege in the criminal context. *In re Grand Jury Subpoena*, 886 F.2d 135 (6th Cir. 1989). Thus, one could argue either that, since historically the privilege has never been claimed, recognizing it would be an extension, or that, since no court has ever recognized a civil-criminal distinction to the privilege, creating one here would constitute an exception.

While *Swidler* rejected a civil-criminal distinction for the privilege as to individuals, other courts have recognized that the governmental context is different, even after that decision, and have limited the privilege for governmental agencies in the criminal context. See *Lindsey*, 158 F.3d at 1272. This position is supported by the leading treatise. 24 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5475, at 125-27. Furthermore, the pedigree of the privilege recognized in *Swidler* was far more impressive than the governmental privilege for which Ryan argues here. *Swidler* focused on whether the privilege survived the death of the individual client, a proposition that the common law had assumed for over a century. *Swidler*, 524 U.S. at 404, citing *Russell v. Jackson,* 68 Eng. Rep. 558 (V.C. 1851). The government attorney-client privilege has no such deep historical roots. We therefore reject Ryan's contention that *Swidler* compels us to find an absolute privilege in the criminal context just because we acknowledge a government attorney-client privilege in the civil context. Even the dissenting judges in the Clinton cases were unwilling to go so far as this. *Lindsey*, 158 F.3d at 1283 (Tatel, J., dissenting) ("[G]overnment lawyers working in executive departments and agencies enjoy a

reduced privilege in the face of grand jury subpoenas"); *Duces Tecum*, 112 F.3d at 935-38 (Kopf, J., dissenting) (finding that in criminal context government could overcome privilege through procedural protections and specific showing of need). Compare *Branzburg v. Hayes,* 408 U.S. 665 (1972) (no First Amendment-based reporter's privilege to refuse to testify before grand jury). Our decision here instead must rest on whether the policy reasons for recognizing an attorney-client privilege in other contexts apply equally when the United States seeks information from a government lawyer.

Ryan argues that they do. His main contention is that the attorney-client privilege has been created "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Upjohn*, 449 U.S. at 389. If government officials know that conversations with attorneys in their offices are not privileged, they will avoid the candid discussion of sensitive legal matters. *Lindsey*, 158 F.3d at 1286-87 (Tatel, J., dissenting). This could lead to more legal violations and corruption in public office. *Duces Tecum*, 112 F.3d at 930-32 (Kopf, J., dissenting). Alternatively, uninformed public officials afraid to obtain legal advice will be unable effectively to carry out their policy objectives, hampering the implementation of government programs. *Id.* at 932. Indeed, absent a privilege, citizens might be unwilling to serve in public office at all.

While we recognize the need for full and frank communication between government officials, we are more persuaded by the serious arguments against extending the attorney-client privilege to protect communications between government lawyers and the public officials they serve when criminal proceedings are at issue. First, government lawyers have responsibilities and obligations different from those facing members of the private bar. While the latter are appropriately concerned first and

foremost with protecting their clients – even those engaged in wrongdoing – from criminal charges and public exposure, government lawyers have a higher, competing duty to act in the public interest. *Lindsey*, 158 F.3d at 1273; Comment to ABA Model Rule 1.13 (noting that government lawyers may have higher duty to rectify wrongful official acts despite general rule of confidentiality). They take an oath, separate from their bar oath, to uphold the United States Constitution and the laws of this nation (and usually the laws of the state they serve when, as was the case with Bickel, they are state employees). Their compensation comes not from a client whose interests they are sworn to protect from the power of the state, but from the state itself and the public fisc.[**] It would be both unseemly and a misuse of public assets to permit a public official to use a taxpayer-provided attorney to conceal from the taxpayers themselves otherwise admissible evidence of financial wrongdoing, official misconduct, or abuse of power. Compare *Nixon*, 418 U.S. at 713 (qualified executive privilege applies in the face of a criminal investigation). Therefore, when another government lawyer requires information as part of a criminal investigation, the public lawyer is obligated not to protect his governmental client but to ensure its compliance with the law.

This discussion necessarily points out another crucial difference between a government lawyer's clients and the

---

[**]Of course, a state may provide an officeholder with an individual taxpayer-provided attorney to represent her in, for example, a *Bivens* action or an independent counsel investigation and could perhaps even specify by statute that the first duty of an agency's general counsel ran always to the head of the agency as individual rather than officer. Here, however, there is no indication that Illinois has abrogated the traditional understanding that an organizational attorney's client is the organization.

clients of other lawyers. Individuals and corporations are both subject to criminal liability for their transgressions. Individuals will not talk and corporations will have no incentive to conduct or cooperate in internal investigations if they know that any information disclosed may be turned over to authorities. *Swidler*, 524 U.S. at 407. A state agency, however, cannot be held criminally liable by either the state itself or the federal government. See *United States v. Price*, 383 U.S. 787, 810 (1967). There is thus no need to offer the attorney-client privilege as an incentive to increase compliance with the laws. True, individual state employees can be held liable, and many have been found guilty of crimes in this very investigation. But the privilege with which we are concerned today runs to the office, not to the employees in that office. See Ill. Sup. Ct. R. 1.13 (2001) (making clear that an organizational lawyer's duty is to the organization, not the organization's individual officers). Just as a corporate attorney has no right or obligation to keep otherwise confidential information from shareholders*, Garner v. Wolfinbarger*, 430 F.2d 1093, 1101 (5th Cir. 1970), so a government attorney should have no privilege to shield relevant information from the public citizens to whom she owes ultimate allegiance, as represented by the grand jury. *Branzburg,* 408 U.S. at 688 (noting grand jury's presumptive "right to every man's evidence").

In formulating privileges, this court cannot ignore the interests and responsibilities of the coordinate entities within our federal system, all of which are sworn to uphold the public interest and committed to the "general duty of public service." *Duces Tecum*, 112 F.3d at 920. Public officials are not the same as private citizens precisely because they exercise the power of the state. With this responsibility comes also the responsibility to act in the public interest. It follows that interpersonal relationships between an attorney for the state and a government official acting in an official capacity must be subordinated to the public interest in good and open

government, leaving the government lawyer duty-bound to report internal criminal violations, not to shield them from public exposure. *Nixon*, 418 U.S. at 712-13 (recognizing executive interest in confidentiality may be lessened in face of criminal investigation); *Lindsey*, 158 F.3d at 1273 (noting public interest in "transparent and accountable government").

In the final analysis, reason and experience dictate that the lack of criminal liability for government agencies and the duty of public lawyers to uphold the law and foster an open and accountable government outweigh any need for a privilege in this context. An officeholder wary of becoming enmeshed in illegal acts may always consult with a private attorney, and there the privilege unquestionably would apply. While Ryan fears that our refusal to recognize a privilege will cause even the most trivial of matters to be taken to outside counsel, this strikes us as unduly alarmist. In fact, analogous rules apply in the corporate realm, where attorneys are repeatedly admonished to advise corporate officials that they are not personal clients of the attorney and may wish to retain other counsel. These rules do not appear to have stifled corporate discussion or proved impossible to administer, and we see no reason why a similar result cannot be countenanced here.

Ryan makes one final argument in favor of his assertion of a governmental privilege: in a word, federalism. He notes that the two leading cases in this area involved the assertion of a privilege by a lawyer for the federal government, vis à vis a federal investigation. From this, he argues that even if federal attorneys lack an attorney-client privilege in criminal proceedings, state-employed attorneys should receive one. See *Grand Jury Subpoena*, 886 F.2d at 138 (implicitly finding that attorney for Detroit City Council could assert privilege); *Duces Tecum*, 112 F.3d at 917 (noting in *dicta* that assertion by a state attorney "implicates potentially serious federalism concerns").

Although we recognize the importance of federalism in general, we do not see its relevance to the present situation. Neither of the cases on which Ryan relies offered a square holding that an attorney-client privilege exists between state government lawyers and their state clients that can override the interests of a federal grand jury. The Eighth Circuit's assertion is *dicta*, and the Sixth Circuit never analyzed the unique features of a government-attorney-client privilege, as it was focused almost entirely on the question whether the attorney's advice in that case was even confidential under state law. *Grand Jury Subpoena*, 886 F.2d at 138-39. Now that the question is before us, we can see no reason why state government lawyers are so different from federal government lawyers that a different result is justified. Although the Supreme Court has recognized important Eleventh Amendment limitations on the ability of private parties to bring suits against the states, it has made clear that the United States may still sue a state to enforce the nation's laws. *Alden v. Maine*, 527 U.S. 706, 755 (1999); *Monaco v. Mississippi*, 292 U.S. 313, 329 (1934). This structural fact about our federal system implies that state officials, including state lawyers, likewise enjoy no immunity from disclosing relevant information to a federal grand jury. See *In re Special April 1977 Grand Jury*, 581 F.2d 589, 592 (7th Cir. 1978).

Finally, we note that the federal courts have never afforded an evidentiary privilege to the states that is not also afforded to the federal government. In fact, the most pertinent case from the Supreme Court cuts the other way. In *United States v. Gillock*, 445 U.S. 360, 370-73 (1980), the Court refused to acknowledge a privilege in a criminal proceeding for statements made by a state senator, even though similar statements would have been privileged under the Speech or Debate Clause, U.S. Const. Art. I, § 6, cl. 1, if they had been made by a federal legislator. The Court rejected the idea that either separation of powers or comity required the judiciary to create a privilege in favor

of state governments.   Instead, "where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields." *Id.* at 373.   Thus, a state privilege should not be recognized if it will impair legitimate federal interests and provide "only speculative benefit" to a state official.   *Id.*   Having already determined that the policy reasons behind the attorney-client privilege do not justify its extension to government attorneys in the context of criminal investigations, we decline the invitation to make any distinction between state and federal attorneys for ill-defined reasons of federalism.

### III

The district court also determined that the current Secretary of State, Secretary White, was the holder of his Office's attorney-client privilege and had the power to waive that privilege as to conversations occurring before he took office.   In light of our holding that none of the conversations between Bickel and Ryan made in their official capacities as General Counsel and Secretary of State are privileged in the face of a federal grand jury subpoena, we express no opinion on this determination. The judgment of the district court is **AFFIRMED**.